J-S22001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RICHARD A. BOLDS, JR. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HENRYETTA BOWE | : | No. 570 EDA 2022 |

Appeal from the Order Entered January 20, 2022
In the Court of Common Pleas of Monroe County Civil Division at No(s):
006157-CV-2019

BEFORE:  BOWES, J., McCAFFERY, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:               **FILED SEPTEMBER 22, 2022**

Richard A. Bolds, Jr. ("Father"), appeals from the January 20, 2022 custody order, wherein the court awarded Henryetta Bowe ("Mother") primary physical custody of their four minor[1] children B.M.B. (born in April 2005), and R.M.B. (born in March 2007), R.J.B. (born in January 2012), and R.L.B. (born in June 2015), permitted Mother to relocate with the children to New York, New York, and denied Father's petition for contempt.  We affirm.

Mother and Father were in a long-term relationship but never married. This custody dispute stems from Mother's sudden separation from Father and move with the children from Kunkletown, Pennsylvania to New York.  The following facts are relevant to our review.

---

[1]  While the parties fifth child, A.B. (age 20), is not involved in this matter, she testified on Mother's behalf during the custody hearing.

Father simultaneously maintained two households in Monroe County, Pennsylvania, and each family is aware of the existence of the other family. Between Sunday nights and Wednesday mornings, Father resided with Mother and their five children in a house Father owned in Kunkletown. During the other half of the week, Father resided with his wife, Joyce Bolds ("Wife") and their four children in a home Father owned in Stroudsburg. Since the homes were in different school districts, each set of Father's children attended different schools.

Father's dual relationships with Mother and Wife continued until July 31, 2019, when Mother moved with the minor children to New York without informing Father of her intention to move or revealing the location of her new residence. The record confirms that Mother planned the move in advance, arranging a moving truck, renting a two-bedroom apartment, and enrolling the minor children in school in New York. N.T., 1/18/22, at 72. Immediately after her departure, Mother filed and obtained a temporary protection from abuse ("PFA") order against Father in the Court of Common Pleas of Monroe County.[2] She included the minor children as protected parties and obtained temporary custody.

After Father discovered Mother had moved out of the family residence, he filed a custody complaint *pro se* in the Court of Common Pleas of Monroe

---

[2] She also obtained an equivalent order in New York, creating temporary jurisdictional issues. That matter is now closed.

- 2 -

County. Father sought sole legal and physical custody of the four minor children. The court directed the parties to appear at a conciliation conference on October 1, 2019.

Meanwhile, Mother's PFA action had been continued several times. On September 30, 2019, one day before the conciliation conference, the Court of Common Pleas of Monroe County conducted a hearing on Mother's PFA petition and dismissed it.[3]

Father appeared at the October 1, 2019 custody conciliation with counsel, whereas Mother participated *pro se*. The conciliation was held off the record. Afterwards, the conciliator submitted a recommended interim order, which the trial court adopted and entered as an interim custody order on November 1, 2019. In light of Mother's disagreement with Father's request for sole physical custody of B.M.B., R.M.B., R.J.B., and R.L.B., or, alternatively, Mother's return to Pennsylvania with the children, the court scheduled a relocation hearing for February 15, 2020. Pursuant to the interim order, the parties shared legal and physical custody, with Father's custodial period occurring every other weekend. The order required each party to submit to custody evaluations before Alison Otto, PsyD., within ten days, and for Dr. Otto to complete the evaluations within sixty days. It also directed

---

[3] The PFA matter has a separate docket and is not part of the certified record on appeal, except for the petition and several court orders Father entered as exhibits at the custody hearing. ***See*** N.T., 1/13/22, at 114; Exhibits B and C.

- 3 -

Father to pay the entire cost of the evaluations. Once Dr. Otto completed the evaluations, the order required either party to petition the court for a full evidentiary hearing to determine the ultimate right of custody.

On February 3, 2020, the parties appeared for a pre-hearing conference. Following the conference, the trial court cancelled the relocation hearing scheduled for February 25, 2020, noting that Father was still working out a payment plan with Dr. Otto and the evaluations were not complete. At no point did Father demand an expedited relocation hearing, which would typically have occurred prior to the relocation, notwithstanding the payment issue. *See* 23 Pa.C.S. § 5337(g)(1)("the court shall hold an expedited full hearing on the proposed relocation after a timely objection has been filed and before the relocation occurs."

On May 21, 2020, Father filed a petition to modify custody and to hold Mother in contempt. In the petition, he requested conciliation to address "short-term custody concerns" while the parties awaited a relocation hearing, noting he had paid for Dr. Otto's services but "difficulties with in-person meetings" due to COVID-19 were delaying Dr. Otto's evaluation. Petition to Modify Custody Order and for Contempt, 5/21/20, at 2. He also sought to hold Mother in contempt for her alleged refusal to provide Father with educational and medical decisions and her failure to undergo a court-ordered parenting educational class. The parties held a second conciliation, which resulted in a July 21, 2020 interim order that refined their interim custodial

arrangement. However, at Father's request, the contempt petition was held in abeyance until the evidentiary hearing.

Father still neglected to demand an expedited relocation hearing and the case remained dormant until September 21, 2021, when the trial court conducted a pretrial videoconference. Mother was unable to connect. Upon learning that Father paid for the custody evaluations in April 2020, but Mother still had not completed her portion of the evaluation, the trial court issued a rule to show cause as to why it should not hold Mother in contempt. However, following a hearing on December 9, 2021, the trial court dismissed the rule to show cause because Mother indicated she underwent her evaluation in 2020 and submitted written information to Dr. Otto after receiving Father's motion for a pre-trial conference in September 2021.

The case finally proceeded to an evidentiary hearing on January 13, 2022 and January 18, 2022. Father and Wife testified on Father's behalf. Mother, who by then had obtained counsel, testified. She also presented the testimony of A.B., the parties' twenty-year-old daughter, and two witnesses who testified about the children's lives in New York. Both parties introduced a plethora of exhibits and stipulated to the introduction of Dr. Otto's evaluation in lieu of her testimony.

On January 19, 2022, the trial court issued a ruling from the bench in favor of Mother. The court explained that it was denying Father's request for primary custody and permitting Mother to remain in New York with B.M.B.,

R.M.B., R.J.B., and R.L.B. over Father's objection to relocation. Thereafter, it delineated its reasoning and consideration of the custody factors and relocation factors set forth in the Child Custody Act ("the Act"), 23 Pa.C.S. §§ 5321-5340. *See* N.T., 1/19/22, at 2-35.

In the ensuing order entered the following day, the trial court set forth the terms of the custodial arrangement. It modified the custodial periods Father had been exercising under the November 1, 2019 interim order. Instead of overnights every other weekend at his home, the trial court limited Father's partial physical custody to eight hours during the day on Saturday and Sunday. The trial court also precluded Father from exercising his physical custody in Monroe County, with exceptions for certain holidays. The court awarded Mother and Father shared legal custody and required Mother to obtain therapy for B.M.B., R.M.B., R.J.B., and R.L.B. The trial court instructed Father to undergo a domestic violence assessment and comply with any recommended treatment. It also directed Mother to reimburse Father fifty percent of the fees Father paid Dr. Otto pursuant to a monthly payment plan. Finally, the trial court denied Father's petition for contempt.

Father timely filed a notice of appeal and a concise statement of errors complained of an appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court complied with Rule 1925(a) by directing this Court to its reasoning set forth on the record on January 19, 2022.

Father presents the following issues for our review:

1.   Was it error for the [trial c]ourt not to order Mother to return to Pennsylvania when she moved to New York with the minor children without a finding of exigency either at the outset of the case or in the final order following full evidentiary hearing, fail to hold a reasonably prompt expedited hearing on relocation after Mother violated the notice provisions of 23 Pa.C.S.A. § 5337 after Father immediately filed an objection to the illegal relocation?

2.   Did the [trial c]ourt commit an error of law and impermissibly place the burden of proof upon Father, the non-relocating party, by ordering him to pay for an expensive custody evaluation, delay any hearing on relocation until the evaluation was complete, confer a presumption in favor of Mother's relocation, and allow evidence to support the relocation when it was Mother's illegal acts which gave rise to Mother's evidence in favor of granting relocation?

3.   Did [the trial court] err in failing to find Mother in contempt for illegally relocating, enrolling the children in another school in New York City, failing to advise Father of school and medical information related to the children even after an interim order sharing legal custody, and limiting Father's ordered custody time?

4.   Did the [trial c]ourt abuse its discretion in making change in physical custody and imposing punitive requirements, by a misapplication of several evidentiary facts and factors, ignoring the uncontroverted findings of the expert appointed by the [trial c]ourt, and making speculative conclusions while showing a bias against Father resulting in a physical custody order which is not in the children's best interest and is not supported by the evidence?

Father's brief at 4.

In reviewing custody orders pursuant to the Act, we utilize the following standard and scope of review.

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no

- 7 -

competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa.Super. 2001)). Moreover,

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa.Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa.Super. 2014).

"[I]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, based on the evidence presented, given due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion in awarding custody to the prevailing party." *E.B. v. D.B.*, 209 A.3d 451, 468

- 8 -

(Pa.Super. 2019) (citation and some quotation marks omitted). To that end, we have explained

> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*D.Q. v. K.K.*, 241 A.3d 1112, 1117 (Pa.Super. 2020) (quoting *Ketterer v. Seifert*, *supra* at 540).

Father's arguments assail both the procedure and the merits in this case, often interweaving issues in his argument. We address his claims as we discern them in the following order: the lack of an expediated relocation hearing; the court's failure to order the return of B.M.B., R.M.B., R.J.B., and R.L.B. at the outset of the case; the court's failure to penalize Mother for relocating without notice; the introduction of post-relocation evidence; the combined hearing on relocation and primary custody; and the court's application of the relocation and custody factors.

We begin with an overview of the Act's provisions regarding relocation. Generally, a parent may not relocate with children without the consent of every individual with custody rights to those children or court approval. 23 Pa.C.S. § 5337(b). The Act requires the relocating parent to provide advance notification of the proposed relocation alongside certain information, which then allows the other parent to file an objection with the court and seek a

temporary or permanent order preventing the relocation. 23 Pa.C.S. § 5337(c), (d). "[I]f the court finds that exigent circumstances exist, the court may approve the relocation pending an expedited full hearing." 23 Pa.C.S. § 5337(g)(3). Otherwise, "the court shall hold an expedited full hearing on the proposed relocation after a timely objection has been filed and before the relocation occurs." 23 Pa.C.S. § 5337(g)(1).

The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child pursuant to ten relocation factors. 23 Pa.C.S. § 5337(i).

> **(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
>> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
>>
>> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
>>
>> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
>>
>> (4) The child's preference, taking into consideration the age and maturity of the child.
>>
>> (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

- 10 -

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h). "Each party has the burden of establishing that the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S. § 5337(i)(2).

In **A.M.S. v. M.R.C.**, 70 A.3d 830, 836 (Pa.Super. 2013), we explained that, when making a relocation decision that also involves a custody decision, the trial court must consider the relevant relocation factors **and** all of the pertinent custody factors outlined in § 5328(a) as follows.

**5328. Factors to consider when awarding custody.**

**(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by

another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a). "In any action regarding the custody of the child between the parents of the child, there shall be no presumption that custody should be awarded to a particular parent." 23 Pa.C.S. § 5327(a).

Father's first claim of error relates to the trial court's failure to hold an expedited relocation hearing promptly after Father objected to Mother's relocation, thereby implicitly condoning Mother's relocation after she failed to provide advance notice of her move. Father's brief at 10-13. As explained *infra*, because Father neglected to present this objection to the court in the first instance it is waived. **See** Pa.R.A.P. 302(a).

The Pennsylvania Rules of Civil Procedure provide the following:

(h) If a non-relocating party has not been served with a notice of proposed relocation and seeks an order of court preventing relocation, the non-relocating party shall file:

(1) a complaint for custody or petition for modification, as applicable;

(2) a statement of objection to relocation; and

(3) a request for a hearing.

Pa.R.C.P. 1915.17(h).

Father filed his custody complaint *pro se*, using a form complaint with an attached handwritten statement. In response, the trial court scheduled a conciliation conference, which is a "prehearing negotiation meeting conducted under the auspices of the Court by the Conciliator." Pa. Monroe Co. R.C.P. 1915.1.

Through counsel, Father then filed a pleading entitled Emergency Petition for Return of the Children and Contempt.[4] Father requested that the court order Mother to return B.M.B., R.M.B., R.J.B., and R.L.B. to Monroe County, find Mother in contempt of court for failing to abide by an unspecified

---

[4] This pleading does not appear in the docket or certified record. It is Father's responsibility to ensure that the record is complete. *See Commonwealth v. Holston*, 211 A.3d 1264, 1276 (Pa.Super. 2019) ("Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty."). Father's reproduced record contains this pleading with a stamp from the Monroe County prothonotary indicating that Father filed it on September 27, 2019. Despite its absence on the docket, it appears Father did in fact file it because it is referenced by an October 1, 2019 order. At any rate, because Mother does not dispute the accuracy of this pleading and did not object to Father's entry of it as an exhibit at the hearing, we shall consider the pleading. *See id*.

- 14 -

court order,[5] modify an existing custody order[6] providing sole custody to Father, and award attorneys' fee to Father. In this petition, Father referred to his custody complaint and implied that he had opposed the relocation therein. *See* Emergency Petition for Return of the Children and Contempt, 9/27/2019, at ¶ 5 ("Father also opposed any relocation of the children to New York City, even though Mother never gave him legal notice of her intention."). Critically, Father neglected to request an expedited hearing on the issue of Mother's relocation with the children.

On the same day as the October 1, 2019 conciliation regarding Father's custody complaint, the court docketed an order directing the parties to

_____

[5] We cannot discern what order Father believes forms the basis of Mother's alleged contempt. In his brief, Father maintains the court should have held Mother in contempt for this "illegal relocation" and her unilateral enrollment of B.M.B., R.M.B. R.J.B., and R.L.B. into school in New York. Father's brief at 17-18. Father relies upon *J.M. v. K.M.*, 164 A.3d 1260 (Pa.Super. 2017), a case where the court found a parent in contempt due to her unilateral relocation without notice or approval. However, in that case, the parent's move violated a court order expressly prohibiting relocation. A definite, clear, and specific order of which a parent had notice is a basic predicate to civil contempt. *See K.M.G. v. H.M.W.*, 171 A.3d 839, 846 (Pa.Super. 2017) (setting forth the requirements of contempt: (1) a definite, clear, and specific order; (2) notice of such order; (3) a volitional act; and (4) wrongful intent). When Mother moved to New York, nothing in the record indicates that the parties were subject to a court order prohibiting relocation or governing the terms of physical or legal custody. Therefore, the court had no basis to find Mother in contempt with respect to her move.

[6] Again, it is unclear to which order Father is referring. Prior to the November 1, 2019 interim order, the only order relating to custody appeared to be the temporary PFA order Mother obtained on August 2, 2019 on behalf of herself and B.M.B., R.M.B. R.J.B., and R.L.B.

conciliate Father's Emergency Petition for Return of the Children and Contempt. The court clerk included a note on the docket that it did not serve the October 1, 2019 order upon the parties because it received it an hour and one-half before the conciliation's start time.

However, it appears that the parties did, in fact, attempt to conciliate the relocation dispute because the conciliator's recommended order references Father's objection to Mother's relocation and Mother's refusal to return to Monroe County. As a result of the conciliation, the court directed the parties to undergo a custody evaluation at Father's expense and scheduled a hearing for February 25, 2020, following the completion of Dr. Otto's evaluations. Again, Father failed to request an expedited relocation hearing.

Father's argument on this issue presupposes that he properly objected to Mother's relocation. However, in Father's initial custody complaint, Father referenced Mother's move to New York but did not clearly object to the move as a relocation or request a hearing. Instead, he described the move as a reason why he should have sole legal and physical custody, which apparently prompted the court to schedule a conciliation to resolve the custody dispute.

Furthermore, assuming arguendo, that Father's emergency petition for return of the children and contempt should have prompted the court to schedule an expedited hearing in lieu of a conciliation, this wrong would have no remedy. As the best interests of the children is always paramount, it is not as if this Court can "un-ring the bell or re-set the clock." *See E.B.*, *supra*,

- 16 -

at 466-467. Mother had already moved and the temporary PFA order prohibited Father from having custody of B.M.B., R.M.B., R.J.B., and R.L.B. and from having contact with Mother up until it was dismissed on September 30, 2019. Afterwards, Father submitted to the conciliation and then did nothing further once the court adopted the conciliator's recommended order. On appeal, Father complains that he had no mechanism to object to the recommendations other than to petition the court for an evidentiary hearing. Father's brief at 12-13. Yet Father fails to explain why he did not avail himself of this option, particularly when it was an "expedited full hearing" pursuant to 23 Pa.C.S. § 5337(g) that he ostensibly desired. Accordingly, we determine Father has waived any objection to the court's failure to hold an expedited full hearing pursuant to § 5337(g) by not presenting such objection to the court in the first instance. **See** Pa.R.A.P. 302(a).

Father's next set of arguments assails Mother's failure to provide notice of her relocation. Father contends that the court should have "sanctioned" Mother for her "illegal relocation." Father's brief at 15. He further claims that the trial court should have precluded Mother from introducing "any testimony or evidence obtained as a result of her illegal relocation" at the hearing. **Id**. Relatedly, he argues the court erred by combining the relocation hearing with the primary custody hearing, which he contends shifted the burden of proof and allowed Mother to benefit from the "fruit of the poisonous tree" from her "illegal move" and gain advantage in the primary custody hearing with

- 17 -

evidence in New York. *Id*. at 16. In light of the allegations of Father's physical and emotional abuse of Mother, these claims warrant no relief.

Regarding Mother's failure to provide advance notice to Father of her relocation, the Act provides that the "court **may** consider" such failure as a factor in the relocation decision, a factor in modifying custody rights, a basis to order the relocating parent to return the child to the nonrelocating party, sufficient cause to order the relocating parent to pay the other parent's reasonable expenses and counsel fees in objecting to the relocation, and a ground for contempt and imposition of sanctions. 23 Pa.C.S. § 5337(j) (emphasis added). Importantly, however, if the court determines the failure to provide notice "was caused in whole, or in part, by abuse," the abuse shall mitigate any consequences of the failure to provide notice. 23 Pa.C.S. § 5337(i).

Initially, we observe the Act's use of the permissive term "may" indicates that the consequences of the failure to provide notice of a relocation is wholly within the trial court's discretion. Additionally, in the instant case, the trial court found Mother and A.B.'s testimony to be credible evidence that Father physically abused Mother on two occasions during their relationship, including hitting her to the point of bruising and an attempting to choke her, and psychologically abusing her by engaging in controlling behavior. N.T., 1/19/22, at 4-5, 17-18. It further found that Mother left the Kunkletown residence in part because of the abuse and her decision to leave without notice

was reasonable. *Id*. at 18. The trial court's findings regarding abuse are supported by the testimony of Mother and A.B. and documentary evidence presented during the hearing. Since the Act leaves the consequences of a party's failure to provide notice within the trial court's discretion and requires the trial court to mitigate any such consequences based on a finding of abuse, we conclude that the trial court acted within its discretion to forgo imposing any of the consequences outlined in § 5337(j).

Regarding Father's related contention that the trial court should have excluded "all testimony or evidence obtained as a result of [Mother's] illegal relocation," Father is simply incorrect. Father's brief at 15. It is obvious that he misconstrues § 5337(l) of the Act as a punitive sanction. In reality, that subsection, which is entitled "Effect of relocation prior to hearing," is neutral insofar as it establishes that "[i]f a party relocates with the child prior to a full expedited hearing, the court shall not confer any presumption in favor of the relocation." 23 Pa.C.S. § 5337(l).

In *B.K.M. v. J.A.M.*, 50 A.3d 168, 175 (Pa.Super. 2012), this Court explained § 5337(l) merely addresses allocation of the burden of proof. Thus, it prohibits the trial court from adopting "a *prima facie* inference that the relocation is necessarily in the child's best interest" and requiring "the party opposing relocation to bear the burden of rebutting such an inference." *Id*.

However, *B.K.M.*'s interpretation of § 5337(l) makes clear that nothing in § 5337(l) requires or permits a trial court to exclude post-relocation

evidence. *Id*. Doing so would confer a presumption against relocation and "convert a statutory provision on the allocation of burdens into what amounts to an extreme sanction on relocations that occur prior to a full expedited hearing." *Id*. Simply put, because the trial court's central duty is to examine the best interest of the children at the time it confers a custody award, it must consider all relevant evidence whether or not the parent followed the procedure in § 5337. *See id*. Thus, the trial court properly followed the law by considering Mother's post-relocation evidence.

As to Father's assertion that the trial court erred by combining the hearing regarding relocation with the issue of primary custody, the record indicates that Father in fact acquiesced to a combined hearing. The crux of this contention is that the consolidated hearing relieved Mother of her burden of proof as to the propriety of the relocation. For two reasons, this claim fails.

First, as previously noted, Father consented to the consolidated hearing. At the September 15, 2021 pre-trial conference, Father's counsel indicated his understanding from the February 3, 2020 pre-trial conference that the court wanted the parties to undergo evaluations and "to hear both issues at the same time." N.T., 9/15/21, at 6. Father's counsel did not object to this procedure, but informed the court that Father desired a return of B.M.B., R.M.B., R.J.B., and R.L.B. pending the relocation hearing. The court declined to order the return of the children in the interim. The court noted that Mother, B.M.B., R.M.B., R.J.B., and R.L.B. no longer had a home in Monroe County, as

Father had rented the home to a tenant. Furthermore, sending the children to the home that Father shared with Wife, and enrolling them in a new school district, would require changes that were contrary to the court's desire to minimize the disruptions to B.M.B., R.M.B., R.J.B., and R.L.B. until it could determine the primary issue of custody. It scheduled the case for a hearing in January 2022, and Father did not object.

Father again acceded to the consolidation at the outset of the January 13, 2022 hearing. After the court indicated that the hearing was to address Father's request for primary custody, his objection to Mother's relocation, and contempt, Father's counsel agreed, then engaged in the following exchange.

> [Trial Court:] Okay. Alright, then counsel are you ready to proceed.
>
> [Father's counsel:] Yes, Your Honor. I don't know if Your Honor wishes to begin with the relocation, or with the primary custody, it would be –
>
> [Trial Court:] Well I think that –
>
> [Father's counsel:] [Mother's] burden if it were relocation.
>
> [Trial Court:] I don't think we get to the relocation if the primary custody is addressed first and if your client is successful. Would you agree with me on that one?
>
> [Father's counsel:] Well, I guess we never got to the relocation to begin with. It's sort of backwards at this point, unfortunately, so, but we can't go back in time or change the course of events of the last two years.
>
> [Trial Court:] No, but I mean, I'm just trying to be efficient as we can here today. So I don't think we get to, if I grant your client's request for primary, we don't get to the issue of relocation.

[Father's counsel:] That would be correct, yes.

[Trial Court:] [Mother's counsel], your position?

[Mother's counsel:] In our view they're all interconnected –

[Trial Court:] They are all certainly interconnected.

[Mother's counsel:] I have no objection to starting with one or the other. I mean, we would essentially present almost identical, if not identical, evidence for all of it.

[Trial Court:] Then [Father's counsel] I'll leave it to you to choose how you want to present the evidence on the issues.

[Father's counsel:] Yes, Your Honor.

[Trial Court:] They are very intertwined.

[Father's counsel:] And yeah, there will be a lot of overlap, so I guess we can call our first witness.

N.T., 1/13/2022, at 8-10. Thus, the record bears out that Father accede to the combined hearings.

Moreover, even aside from Father's acquiescence to the trial court's suggested procedure, we discern no abuse of discretion in the trial court's determination because it did not alter the parties' respective burdens of proof. The issue of relocation in this case could not be divorced from the issues of primary custody given the allegations of abuse, the lack of an existing custody order, and the distance between the parties. There is no doubt that the trial court's relocation decision also implicated its custody decision, and as discussed more *infra*, the trial court did analyze all of the required factors.

*See A.M.S.*, *supra*, at 836 (directing trial courts to consider all ten relocation factors and all sixteen custody factors).

That Father presented his case first does not mean that the trial court relieved Mother of her burden. Mother still had the burden of proving the relocation was in the best interest of B.M.B., R.M.B., R.J.B., and R.L.B. based on the § 5337(h) factors. Father had the burden of establishing the integrity of his motive in opposing the relocation. 23 Pa.C.S. § 5337(i). Because both parties sought primary custody, they both had the burden of demonstrating the best interest of B.M.B., R.M.B., R.J.B., and R.L.B. pursuant to § 5328. *See* § 5327(a). Upon review of the certified record, we conclude the trial court properly allocated the parties' respective burdens of proof and no relief is due.

Next, we address Father's critique of the trial court's custody decision, claiming the trial court abused its discretion in permitting Mother to remain in New York and have primary custody of the children. Father's brief at 13-14, 20-28. He contends that the trial court failed to discuss all the relocation factors, improperly blended the analysis of the relocation and custody factors, and did not credit Father for factors that clearly were in his favor. *Id*. at 13-14, 24-26. According to Father, the trial court ignored obvious signs that Mother's credibility was suspect and denied him custody to punish him for his immoral lifestyle. *Id*. at 22-24, 26-27.

Our review of the trial court's analysis reveals the following. With respect to the relocation factors, the court found that § 5337(h)(1), (2), (3), (4), (5), (6), (7), and (9) favored relocation, and § 5337(h)(8) was neutral. With respect to the custody factors, the court weighed § 5328(a)(1), (2), (3), (4), (6), (7), (8), (9), (10), (12), (13), and (15) in Mother's favor. It found § 5311(h)(5), (11), and (14) to be neutral.

In explaining her decision to grant Mother primary custody and remain in New York, the trial court credited the testimony of Mother and the parties' adult daughter, A.B., who both stated that Father was abusive, controlling, and neglectful towards maintaining the Kunkletown residence. N.T. 1/19/22, at 4. Specifically, the trial court found that Father physically and emotionally abused Mother and emotionally abused B.M.B., R.M.B., R.J.B., and R.L.B. The court pointed to the demeanor of Mother and A.B., as well as physical evidence corroborating their claims, such as a photograph of Mother's black eye, a photograph of the family dog with a zip tie on its mouth, and a video that A.B. recorded demonstrating the frequent lack of running water in the house. *Id*. at 5. The court expressed concern about some of the trauma B.M.B., R.M.B., R.J.B., and R.L.B. experienced. For example, the trial court highlighted an incident where Father shot and killed the family dog on Thanksgiving and left the dog's carcass n the yard while he returned to Thanksgiving with his Wife and family in Stroudsburg. *Id*. at 15. By the trial court's assessment, Mother's departure from Monroe County with B.M.B., R.M.B., R.J.B., and

R.L.B. was not to seize the children from Father, but to provide space to improve her mental health, eliminate the unhealthy home environment, and to figure out how the children could maintain health contact with Father. *Id*. at 24.

By contrast, the trial court did not credit much of Father's testimony and noted his focus on belittling Mother rather than demonstrating how it served the children's best interest to be in his primary custody. *Id*. at 6. The court also emphasized the children's disclosures to Dr. Otto that Father demeaned Mother in front of them, whereas Mother refrains from discussing Father. *Id*. at 19. The court explained that it was concerned about potential backlash by Father because Father fails to accept his role in creating an environment of abuse, control, and fear. *Id*. at 14. The court indicated that it hoped to return to overnights on weekends, but it did not feel it was safe to do so until Father obtained an assessment and counseling for his anger, violence, and control. *Id*. at 15.

The court determined Mother has always been the primary custodial parent and did much of the "heavy lifting" of parenting, in contrast to Father, who "came and then . . . left and went back to his other life." *Id*. at 3, 9. Tellingly, even though B.M.B., R.M.B., R.J.B., and R.L.B. now live in a small apartment with Mother, the children all told Dr. Otto that they preferred Mother to maintain primary custody. *Id*. at 17. In this regard, the court also found that the relocation benefitted Mother and the children in a variety of

ways, including distancing them from the chaos, turmoil, and abusive situation they experienced living with Father half the week. *Id*. at 22.

The court acknowledged R.J.B., and R.L.B. had a playful, affectionate relationship with Father, but in the trial court's view, this only was a "sliver of parenting" during playful times. *Id*. at 10. The court noted the recurring dynamic with the older siblings, which was a growing resentment towards Father and the feeling that his family with Mother was inferior to his family with Wife. *Id*. This was exacerbated by Wife's treatment of the children as guests in her home and underlying tension by the two families that pervaded the children's descriptions of Wife to Dr. Otto, in contrast to Wife's professed care for the B.M.B., R.M.B., R.J.B., and R.L.B. *Id*. at 8. Additionally, Father struggled to keep up with the maintenance of two homes, often prioritizing problems with Wife's home and letting issues at Mother's home linger. *Id*. at 11-13. He also did not keep up with children's dental work, which led the trial court to find that Father is willing to sacrifice B.M.B., R.M.B., R.J.B., and R.L.B.'s well-being when he believed his finances required it. *Id*. *See also* 23-31 (analyzing the custody factors in a similar fashion).

Ultimately, the trial court's analysis was thorough. The court properly examined each relocation and custody factor, and its factual findings are supported by the certified record. That the analysis overlapped on many factors was not an error by the trial court; instead, it was consistent with the law. As this Court has commented, "[a] court should avoid dissociating the

issue of primary custody from the issue of relocation, and should instead decide the two issues together under a single umbrella of best interests of the children." **S.S. v. K.F.**, 189 A.3d 1093, 1098 (Pa.Super. 2018) (citations and quotation marks omitted).

Father's criticisms essentially ask this Court to override the credibility determinations of the trial court, reassess the evidence to credit Father's position, and re-weigh the factors to arrive at a different outcome. This we cannot do. It is axiomatic that the trial court is the arbiter of credibility, and this Court cannot interfere with the trial court's careful and thorough consideration of the best interests of children with findings that are supported by the record. **A.V.**, **supra**, at 820. The trial court, as the finder of fact, has the discretion to "determine which factors are most salient and critical in each particular case." **M.J.M. v. M.L.G.**, 63 A.3d 331, 339 (Pa.Super. 2013).

Relatedly, we reject Father's argument that the trial court "seem[ed] focused on punitive measures upon Father, rather than focusing on the best interests of the children." Father's brief at 22. Father contends that the trial court "accuses" him of being a "bigamist," attributes all negative findings about his dual relationships to him and not Mother, and "inserted [the court's] own morality" *sua sponte*. **Id**. at 23.

As this Court has recognized, a parent's morality or sexual lifestyle is not a custody factor. **V.B. v. J.E.B.**, 55 A.3d 1193, 1198 (Pa.Super. 2012) (holding the trial court erred by "inject[ing] artificial morality concerns that

the legislature has deemed irrelevant" to the custody determination). In ***V.B.***, this Court held the trial court's general disfavor of polyamory pervaded its custody determination despite no evidence that the father's past participation in such a sexual arrangement adversely affected the children. ***Id***. at 1201. Relying upon the established concept that a party's morality is irrelevant to a custody determination without any evidence the morality has a detrimental effect on a child, this Court reversed the trial court's custody award to the children's grandparents. ***Id***.

Father is correct that the trial court did not mince words about Father's maintenance of two long-term relationships and families, stating the following:

> And nobody is talking about the 3,000-pound elephant in the room. That is leading a bigamous life. [Father's] technically not married to [Mother]. But nobody is talking about what your – what [Mother and Father's] decision to live in this manner was doing to the mental wellbeing of the children.

N.T., 1/19/22, at 7. The court proceeded to distinguish between the parents' respective roles, indicating its belief that Mother entered into the arrangement due to her youth and love for Father, whereas Father was "leading a double life" and behaving narcissistically. ***Id***. The court indicated that was "not cutting [Mother] all the slack here because she chose to stay and she didn't have to, and she chose this life and she didn't have to," but that "what [Father] was doing is a different ballgame" that "goes to the morality that you're teaching your children." ***Id***. at 9.

Despite the trial court's comments, upon our review of the certified record as a whole, we find this case to be distinguishable from **V.B.** In the instant case, the record contained evidence of the negative affect Father's maintenance of two families had upon B.M.B., R.M.B., R.J.B., and R.L.B. and Father's abuse and control over Mother and the minor children.

After assessing the family, Dr. Otto noted Father's narcissistic personality traits in her assessment of him, and noted concerns about his propensity to anger, controlling nature, and authoritarian parenting style. **See** N.T., 1/13/22, at Exhibit A.

Mother described needing Father's permission to go places and his monitoring of her whereabouts by checking her gas gauge. N.T., 1/18/22, at 28. He supervised her visits with family, requiring her to obtain his permission and scrutinizing the parameters of those interactions. **Id**. at 49-50. On one occasion, Father grabbed Mother's neck and professed, "he loved her to death" while choking her. **Id**. at 29-30. During another episode, he gave Mother a black eye and she ran out of the house so the children would not see it. **Id**. at 31. As it relates to the children, Mother testified that, in her view, B.M.B. and R.M.B. are much happier upon moving to New York because their individual personalities are coming through. **Id**. at 64. In Father's house, the children could not express their opinions and had to be obedient. **Id**.

A.B. testified about the black eye incident, observing that Mother fled from the house with a black eye after she had been upstairs arguing with

Father. N.T., 1/13/22, at 174. Father left A.B. and the other children home alone in the home, and told them to call him if Mother did not return so he could take them all to Wife's house. *Id*. She recalled that the children were so afraid to go to Wife's home with Father that they called Mother begging her to return. *Id*.

In addition, A.B. confirmed Father's interruption of their Thanksgiving dinner to shoot the family dog. *Id*. at 169-70. Furthermore, she described a different incident where Wife no longer wanted to be troubled by a dog at her house. Accordingly, Father brought the dog to Mother's home on Christmas morning, zip-tied the dog's mouth shut so tight that it was bleeding, and left the dog behind while he returned to Wife's home to celebrate Christmas with Wife and his other children. *Id*. at 171-72.

As it relates to her homelife with Father, A.B. testified about Father's expectation that she and her siblings greet him enthusiastically when he returned from his house with Wife and stated that he would inflict punishments if the children did not comply. *Id*. at 173. As one of the most evident examples of Father's domineering control, A.B. testified that Father kept R.L.B.'s existence secret from Wife for three-years by prohibiting all of his children, in both families, from telling Wife about the child. *Id*. at 176.

Finally, A.B. described living without running water for years. Father would switch on a valve in the basement when he arrived mid-week, but the running water would eventually run out. He prohibited Mother from turning

on the valve or getting it fixed. *Id*. at 208-09. A.B. noted, however, that the water always worked at Wife's house. *Id*. at 185-188, 193.

Thus, despite the trial court's harsh comments about Father's lifestyle, the certified record reveals that it based its assessment of the factors upon Father's behavior, not its preconceived notions or judgment against Father's immorality.

For all of the foregoing reasons, we conclude the trial court did not abuse its discretion in awarding Mother primary custody of B.M.B., R.M.B., R.J.B., and R.L.B. in New York, and restricting Father's periods of physical custody to daytime visits on the weekends in New York.

Father's final argument relates to his May 2020 petition for contempt. The following legal principles are relevant. "Our review of contempt orders is limited to determining whether the trial court abused its discretion." *E.B.*, *supra* at 469. In the context of contempt orders,

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Id*.

This contention does not relate to the relocation. The petition alleged that Mother refused to provide information related to education and medical treatment, limited telephone contact with the children, refused Father's proposal for additional time, and failed to comply with co-parenting

requirements. *See* Petition to Modify Custody Order and Contempt, 5/21/2020, at 2.

On appeal, Father contends that the trial court erred in denying his contempt petition because Mother failed to bolster her testimony that she provided notice to Father by phone or email in advance of the children's medical appointments. Father's brief at 19. This argument garners no relief. As the trial court pointed out during the evidentiary hearing, it was within the trial court's discretion to find Mother's testimony credible without the need for corroborating evidence. N.T., 1/18/22, at 87-90. Father also blames Mother for his inability to obtain information from the schools in New York, yet he did not clearly establish that his inability to obtain information was due to Mother's actions as opposed to bureaucratic rules of the schools.

Finally, Father contends the trial court erred by not holding Mother in contempt due to her delay in cooperating with all aspects of Dr. Otto's evaluations. Father has waived this issue by not presenting it to the trial court in the first instance. Pa.R.A.P. 302(a). The only reference regarding the evaluations in his contempt motion was an averment that he paid for the evaluations but "given the difficulties with in-person meetings this evaluation has been somewhat delayed." Petition to Modify Custody Order and for Contempt, 5/21/20, at ¶ 8. Nowhere does he indicate that he sought to hold Mother in contempt for these delays. Instead of filing a contempt motion later in 2021, he chose to request a pre-trial conference. There, the trial court *sua*

*sponte* issued a rule to show cause regarding Mother's role in the delay of the evaluations and dismissed the rule after Mother finalized her portion. Insofar as the trial court did not it misapply the law or exercises its discretion in an unreasonable manner in denying Father's petition for contempt, no relief is due.

In sum, upon review of Father's arguments, we conclude that the trial court did not err or abuse its discretion in awarding Mother primary custody of B.M.B., R.M.B., R.J.B., and R.L.B., permitting Mother and the children to remain in New York, and denying Father's motion for contempt. We are satisfied that the trial court conducted a thorough analysis of the best interests of B.M.B., R.M.B., R.J.B., and R.L.B., with factual findings that are supported by the record.

Order affirmed.


*Judgment Entered.*

_____
*Joseph D. Seletyn, Esq.*
*Prothonotary*


Date: <u>9/22/2022</u>